UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

JONATHAN CHOMA, )
)
    Plaintiff, )
)
v. ) Case No. 5:18-cv-118
)
DANIEL TUCKER, )
)
    Defendant. )

## OPINION AND ORDER

Weddings are occasions of great joy. They offer us the promise of a new family. Relatives and friends have the chance to renew their ties in a happy, festive setting. People talk and dance and enjoy themselves. But, like any family gathering, weddings may also bring together guests who do not get along. Such was the state of events at the Trudo family's wedding of their son, held at their home in Castleton, Vermont, on September 26, 2015.

On May 18, 2021, the court conducted a bench trial concerning claims by one wedding guest against another arising from an incident at the reception. The court's findings below are based on the testimony of the witnesses and the exhibits admitted at trial.

### Facts

Plaintiff Jonathan Choma grew up with Peter Trudo. Their mothers were close friends in college. The families' homes were not far apart on Eaton Hill Road in Castleton, Vermont. As a boy, Jonathan was treated as a nephew by the Trudos. Later, in high school, Jonathan and Peter were members of a group of friends that shared an interest in fixing, building, and running motor vehicles while enjoying one another's company.

As young adults, plaintiff and his friends honored their common interest in cars by building what they called a "field car" to present to the groom when one of them married. A field

1

car is only good for driving in fields. It is a used car, purchased by the group for a few hundred dollars, and "fixed up" by perforating or removing the muffler so that it would be loud and spray-painting the body work with wedding messages. It is presented as a gag gift at the reception.

When plaintiff and his friends assembled for their friend Peter Trudo's wedding, they followed tradition. They purchased a car in Rutland for about $300 and trailered their find to the Choma home in Castleton where they spent the afternoon before the wedding decorating it. The wedding was scheduled for late afternoon with a reception in a tent to follow. The wedding party was lucky with the weather which was warm and bright for late September.

It is necessary to leave the thread of the story for a moment to describe Mr. Choma's life. After graduating from Fair Haven High School, he attended culinary school and started his career cooking at a Ritz Carlton hotel in Florida. Over the course of three years, he moved up to *chef de partie* and then served for 3 ½ years as executive chef at the Mar-a-Lago resort in Palm Beach. He then served as a private chef for a single family for ten years. Over time, his responsibilities expanded to the management of the family's staff and multiple homes. Two years ago, he formed a property management company to offer these services more broadly in the Palm Beach area. Mr. Choma is an intelligent, capable person who has succeeded in his profession.

Mr. Choma attended the wedding ceremony with his family. Afterwards, he headed for the reception tent where he put the final touches on an extensive display of fruit, nuts and charcuterie which had been his gift to the party. Due to his culinary background, he was pressed into service to tap a keg of beer which was proving stubborn. He then mingled with the other guests until it was time to get the field car. He wanted to present the field car to the groom while

it was still light. Mr. Choma left the reception with two friends and returned a few minutes later in the field car. The sun had set and it was dusky.

Mr. Choma drove the car to the reception. His friend Jesse Larkin was in the front passenger seat. Sean Kuhens was in the back seat. The reception tent was erected near the Trudos' free-standing garage, south of the main home. To get there, Mr. Choma drove around a barrier which the groom's father, Graham Trudo, had placed to keep traffic away from the area of the party. Mr. Choma brought the car to a stop in front of the tent. The groom Peter Trudo immediately came out to admire his gift. But because the best man was starting his wedding toast, Peter returned inside and delivery of the field car to its new owner was delayed. In the interval, Mr. Choma drove around the reception tent, past the Porta-Potty and into the field behind the tent where he and his friends used the field car for its intended purpose—driving back and forth in the field.

Within a few minutes, the field car returned and stopped for a second time in front of the tent. Mr. Choma's mother and other guests gathered around to admire it. Mr. Choma looked up to see the defendant Daniel Tucker approaching the car from the front. It is necessary to digress again to introduce the defendant Daniel Tucker. Mr. Tucker was also a wedding guest. Like the Choma family, he lives close to the Trudos. He and Graham Trudo are good friends. He attended the wedding with his wife Sharon. At about the time the field car arrived at the wedding tent for the first time, Sharon left the reception for a few moments. She returned to her husband very upset about the car. She did not testify so exactly what occurred is unknown, but it was not good. Mr. Tucker immediately left the table, followed by his neighbor and friend Luis Bauzo, a retired pediatrician.

Once outside, Mr. Tucker confronted the field car. He was furious. He shouted, "get the f--- out of the car." He was armed. He drew his handgun and aimed it in a two-handed shooter's stance at the windshield of the car. He then approached the car from the driver's side. He reached through the open window and grabbed Mr. Choma. He attempted to pull Mr. Choma out of the door. He put the gun against Mr. Choma's head. Mr. Choma's mother was present and sought to save her son. Mr. Tucker shoved Ms. Choma away. Mr. Choma implored Mr. Tucker to calm down.

The incident was quickly over. Dr. Bauzo put his body between Mr. Tucker and the car. Mr. Tucker moved back. He and Dr. Bauzo were joined by Graham Trudo. Mr. Tucker continued to walk off. He and his wife left the wedding and returned home.

Mr. Trudo spoke angrily with Mr. Choma about removing the car. Mr. Choma—shocked by the discovery that he had soiled and wet himself—reversed the car away from the tent. He returned to his parents' home. Later that night he called the Castleton police who initiated an investigation that led to Mr. Tucker's guilty plea in 2018 in state court to misdemeanor charges of reckless endangerment and simple assault.

In the course of his plea colloquy in state court, Mr. Tucker admitted to pointing a gun at Mr. Choma.

> The Court: Do you agree that on September 26th there was an incident—of 2015—at that time you had a firearm; it was loaded; it was operable; and you pointed it in the direction of Mr. Choma? And by doing so, he was placed in danger of death or serious bodily injury? And also on that date in time, you had an interaction with Deborah Choma where you shoved her. And by shoving her, your conduct was reckless and it caused bodily injury to her, which is any pain or impairment; do you understand that?
>
> The Defendant: Yes, Your Honor.
>
> The Court: And is that what happened on that date?
>
> The Defendant: Yes, Your Honor.

4

(Plaintiff's Ex. 8 at 10.)

There is an issue about which the parties disagree. At trial, defendant introduced testimony from Graham Trudo that Mr. Choma was heavily intoxicated when he arrived in the field car and that the interior of the car reeked of marijuana. Mr. Choma testified that he had little or nothing to drink that evening and that he and his friends were busy all afternoon buying and decorating the field car. He denies marijuana use. He says he was sober. His account was confirmed by the testimony of Mr. Larkin, who spent the day with him and was present in the field car, as well as another friend, New York City Police Detective LaFond, who spoke with Mr. Choma from New York by phone shortly after the incident and detected no sign of intoxication.

The court credits Mr. Choma's testimony on this issue. It is not likely that he attended the wedding ceremony heavily intoxicated. He had been busy at home fixing up the field car. The ceremony was relatively brief. He went directly to the reception where he pitched in to help with his charcuterie display and the beer keg. He was also entrusted with the care of a two-year old guest whom he carried about while visiting with friends and family. This is not the behavior of a drunk person. He left the reception for a few minutes before returning with the field car. His testimony that he had little or nothing to drink at the reception is consistent with the testimony of two of his friends. It is more credible than Mr. Trudo's testimony that Mr. Choma was severely intoxicated and high on marijuana.

There is also a factual dispute about whether Mr. Tucker threatened Mr. Choma with the gun while leaning into the car from the driver's side window. Mr. Tucker admitted to Judge Zonay at his state court hearing that he pointed the gun at Mr. Choma. His attorney argues that because he reached into the car to grab Mr. Choma with both hands, he could no longer have

5

been holding the gun. Mr. Tucker did not testify. Mr. Choma testified that the gun was at the side of his head. Mr. Larkin, the front seat passenger, testified that he saw the bluing on the barrel of the handgun. In the absence of testimony from Mr. Tucker, the court believes Mr. Choma's and Mr. Larkin's testimony that Mr. Tucker still had the gun when he stood at the driver's side window and reached in to try to pull Mr. Choma out of the car. Both men saw or felt the weapon. Given Mr. Tucker's angry, profane state of mind, it is not likely that he put his gun away until Dr. Bauzo intervened to separate him from Mr. Choma and restore a measure of calm.

Mr. Choma has suffered as a result of Mr. Tucker's conduct. He returned to Florida shortly after the wedding and experienced a short-term severe emotional reaction to the traumatic incident. He received counseling by video connection from Dr. William Kelley, a psychologist in Rutland recommended by his mother. Dr. Kelley testified at trial that Mr. Choma's long-term symptoms of anxiety and "replay" of the incident in his mind as well as his increased "startle response" and disturbed sleep were typical experiences of people exposed to trauma. Dr. Kelley explained that Mr. Choma—like others who have been placed in fear of mortal injury—no longer experiences the world as safe and welcoming. Mr. Choma and Dr. Kelley have worked on relaxation and "mindfulness" techniques aimed at reducing Mr. Choma's anxiety. One unfortunate consequence of the wedding incident is that Mr. Choma avoids returning to Vermont to visit his family because the trip reminds him of the deep fear he experienced when Mr. Tucker pointed the gun at him.

Mr. Choma's out-of-pocket expenses are limited to $490 for the cost of seven counseling sessions with Dr. Kelley. He has lost no income. Instead, his business career appears to have prospered. His principal damage is the anxiety he continues to experience as a result of the traumatic experience.

### Elements of the Three Causes of Action

Mr. Choma has pled three causes of action: assault, battery, and intentional infliction of emotional distress. The court reviews the legal elements of each:

The elements of the civil tort of assault are:

1. A threat to commit an act of physical violence against the plaintiff;

2. By a person with the ability, means, and apparent intention, to carry his threat into execution.

*Clark v. Downing*, 55 Vt. 259, 262 (1882). The threatening conduct must be intentional. *Wilson v. Smith*, 144 Vt. 358, 477 A.2d 964 (1984) (holding that assault and battery by a person suffering from psychosis was not actionable). Assault is the remedy for a near-miss—violence which appeared imminent but did not occur. *See Bishop v. Ranney*, 59 Vt. 316, 7 A. 820, 821 (1887) ("Following the angry controversy of words was a threatening movement, in close proximity, accompanied by violent language in the nature of a threat, and by a much larger and more powerful man than the plaintiff; and the demonstration caused the plaintiff to fear violence.").

The closely related tort of battery adds the element of an unconsented touching or physical contact with the plaintiff to the "fear inspiring demonstration of violence, without in fact inflicting it" that is the core element of civil assault. *Fitzgerald v. Fitzgerald*, 51 Vt. 420, 422–23 (1879).

The elements of the tort of intentional infliction of emotional distress are:

1. Outrageous conduct;

2. Done intentionally or with reckless disregard of the probability of causing emotional distress;

7

    3. Resulting in the suffering of extreme emotional distress;

    4. Actually or proximately caused by the outrageous conduct.

*Fromson v. State*, 2004 VT 29, ¶ 14 (2004).

Mr. Tucker's conduct satisfies the elements of each of these causes of action. With respect to assault, pointing a gun at Mr. Choma while shouting in an angry and profane manner and grabbing him by the collar amounts to a threat to cause physical harm. Mr. Tucker admitted to the state court judge that the gun was operable and loaded, thereby satisfying the requirement that he had the ability, means, and apparent intent to make good on the threat to Mr. Choma by shooting him.

With respect to battery, Mr. Tucker grabbed Mr. Choma and sought to pull him from the car. The physical contact, rough and abusive, adds the necessary element of unconsented touching to the threat of harm.

With respect to the IIED claim, pointing a gun at an unarmed person who presents no immediate danger to anyone because he is sitting in a parked car, speaking with his mother, is outrageous conduct. Mr. Tucker's conduct was intentional. There is credible evidence that it caused extreme emotional distress to Mr. Choma.

### **Damages**

"In an action for assault and battery damages are recoverable for mental suffering consisting in a sen[s]e of insult, indignity, humiliation or injury to the feelings where the plaintiff suffered physical injury as a result of the assault. . . . [E]lements of damage in such a case are fear, anxiety and humiliation." *Gray v. Janicki*, 118 Vt. 49, 53, 99 A.2d 707, 710 (1953). Exemplary damages may be awarded due to "the nature of the act of the defendant for which the plaintiff recovers. They are given in enhancement, merely, of the ordinary damages, on account

of the bad spirit and wrong intention of the defendant manifested by the act, and are recoverable with the ordinary damages, under the common allegation that the act declared for was done to the damage of the plaintiff." *Hoadley v. Watson*, 45 Vt. 289, 292 (1873).

The measure of damages for intentional infliction of emotional distress is essentially the same: compensation for the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct." *Sheltra v. Smith,* 136 Vt. 472, 476 (1978). Punitive damages may be awarded upon a showing of "personal ill will, … carried out under circumstances of insult or oppression, or manifest[ing] a reckless and wanton disregard for plaintiff's rights." *Crump v. P&C Food Markets, Inc.*, 154 Vt. 284, 297 (1990).

The court finds that Mr. Tucker's assault and battery upon Mr. Choma and his outrageous conduct in threatening Mr. Choma with a firearm and grabbing him by the collar while holding the gun close to his head caused severe emotional distress. Mr. Choma thought he might die at the hands of a person who had lost self-control and was acting irrationally. The fear was sufficient to cause Mr. Choma to lose control of his bodily functions. The court credits Dr. Kelley's testimony that, like other people who fear that they may die, Mr. Choma has experienced long-term symptoms of post-traumatic stress disorder, including sleep disturbance, heightened vigilance, and an association of his home state with the fear he experienced at the wedding.

The $490 in counseling costs are reasonable in amount and necessary for the care of Mr. Choma for the trauma he experienced. There are no other special damages—out-of-pocket losses such as lost income or cost of future care.

The court awards general damages in the amount of $25,000. This award is intended to compensate Mr. Choma for the fear, humiliation, and long-term emotional consequences of Mr.

Tucker's conduct. The court selects this figure because it is sufficient to address both the immediate fearful experience and the lingering effects of the confrontation. The court recognizes that in many respects, Mr. Choma continues to be successful in life, especially in his development of his own business. But the court also recognizes that he has suffered from genuine anxiety and stress from the misconduct of Mr. Tucker.

The court awards punitive damages in the amount of $15,000. Punitive damages are appropriate because Mr. Tucker's conduct was intentional and criminal. He chose to attend a neighborhood wedding reception armed with a firearm. Provoked by his wife's account of her encounter with Mr. Choma, he confronted an unarmed man in a parked car and drew his gun. He ignored the pleas of Mr. Choma and others, including Mr. Choma's mother, to calm down. He laid hands on Mr. Choma and sought to drag him out of the car. Both parties are very fortunate that Dr. Bauzo was on hand to prevent further violence. The punitive damage award is intended to address the criminal wrongfulness of Mr. Tucker's conduct by requiring him to pay damages in addition to the court's calculation of a just compensatory award.

Plaintiff shall submit a bill of costs within 10 days. Any response is due within 10 days. The court will then enter final judgment in favor of plaintiff in the amount of $40,490 plus taxable costs.

Dated at Rutland, in the District of Vermont, this 26th day of May, 2021.

Geoffrey W. Crawford, Chief Judge
United States District Court